UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| YELLOW JACKET PARKING, LLC, | ) |
| Plaintiff, | ) ) ) |
| v. | ) Case No. 3:15-cv-1098 ) |
| SP PLUS CORPORATION, | ) ) |
| Defendant. | ) |

## MEMORANDUM

Pending before the court is a Motion to Dismiss Defendant's Counterclaim (Docket No. 16) filed by the plaintiff, Yellow Jacket Parking, LLC ("Yellow Jacket"), to which the defendant, SP Plus Corporation ("SP"), has filed a Response (Docket No. 21). For the reasons discussed herein, the motion will be denied.

## BACKGROUND AND PROCEDURAL HISTORY

This action arises from a dispute over the lease of real property located at 801 Church Street in Nashville, Tennessee (the "Property"). The action was initially filed by the owner of the Property, plaintiff Yellow Jacket, in the General Sessions Court of Davidson County, Tennessee on September 30, 2015. (Docket No. 1-1.) On October 14, 2015, it was removed to this court on grounds of diversity jurisdiction. (Docket No. 1.) The initial Complaint states simply that defendant SP, the purported current lessee of the Property, is unlawfully detaining the Property and that Yellow Jacket has a rightful claim to possession, asserting claims for "breach, failure to maintain, waste, damages, forfeiture of lease, and the costs of the cause."

(Docket No. 1-1.) The Complaint does not contain any specific factual allegations explaining Yellow Jacket's theory for how SP breached or forfeited its lease of the Property.[1]

On October 22, 2015, SP filed an Answer, denying that is has breached the terms of its lease agreement with Yellow Jacket. (Docket No. 5.) On April 7, 2016, with leave of court, SP amended its Answer by filing a Counterclaim against Yellow Jacket for breach of the duty of good faith and fair dealing. (Docket No. 13.) Attached to the Counterclaim is the lease agreement that SP alleges was entered into by predecessors-in-interest to the parties and now governs the terms of its lease of the Property from Yellow Jacket. (Docket No. 13-1 (the "Lease").)[2]

The Lease, which was entered in 1946, provides for a 99-year term with an increasing rent schedule, under which the lessee is guaranteed "peaceable and uninterrupted possession" of the Property so long as the Lease terms are met. (*Id*. at p. 6.) Under the Lease, the current rent for the Property is $20,000 per year, and the rent will remain at that rate through the end of the Lease term in 2045. (*Id*. at p. 7.) The Lease also provides that the lessee was bound to erect a building on the Property, costing at least $200,000, within 5 years of entering the Lease in 1946. (*Id*. at p. 8.) Relatedly, the lessee was required – at the time the Lease was entered – to deposit $50,000 in government bonds or cash with Commerce Union Bank to guaranty performance of

---

[1] In support of its Motion to Dismiss SP's Counterclaim, however, Yellow Jacket appears to argue that SP breached the lease agreement by unilaterally, and without notice or consent, demolishing an existing parking structure on the Property for the purpose of constructing a surface parking lot, without first providing Yellow Jacket with a $50,000 security deposit and plans for a new building. As detailed below, these allegations conflict with the version of events and interpretation of the lease agreement that is recounted in SP's Counterclaim. For purposes of the pending Motion to Dismiss the Counterclaim, the court will take SP's allegations, and not Yellow Jacket's, as true.

[2] Yellow Jacket does not contest that the Lease placed in the record by SP is an accurate copy of the agreement for the lease of the Property that was entered into by the parties' predecessors–in–interest, and Yellow Jacket references the same Lease in its Motion to Dismiss.

this obligation. (*Id*.) The Lease further provides that, prior to commencing construction of said building on the Property, the lessee was required to submit for approval, plans and specifications for the building (including a cost estimate) to Jay Stephenson, attorney for the lessor at the time, along with a construction bond for the estimated cost of constructing the building. (*Id*. at pp. 9-11.) Upon submitting these items, the initial $50,000 guaranty bond would be returned to the lessee. (*Id*.) The Lease also provides that, had the lessee failed to provide construction bonds or to erect the building within five years of entering the Lease, the lessor would have had the right to cancel the Lease. (*Id*. at pp. 9, 11.)

According to the Lease, the lessee is required to maintain and insure the requisite building, and any other buildings erected on the Property, for the duration of the Lease term. (*Id*. at p. 12.) The Lease further provides that, if the existing building is destroyed or damaged beyond repair, the lessee is bound to erect a new building, again at a cost of at least $200,000, within five years, and must continue to pay rent as provided under the Lease at all times. (*Id*. at pp. 14-16.) While the Lease does not expressly state that, in the event the existing building is destroyed or damaged beyond repair, the lessee is bound to again submit to the lessor the plans for a new building and a construction bond for the estimated cost, such terms can be reasonably read into the Lease. This is because the Lease also provides, in a separate section, that, once the original contemplated building is erected, the lessee has the right at any time to erect a new building to replace the existing structure, or to erect additional buildings on the Property, "but it shall not commence said work or tear down the then existing improvements except that it shall again do each and every one of the things that it is required to do in connection with the tearing down and erection of said first contemplated new building." (*Id*. at p. 12.) The Lease is silent, however, with respect to whether there is any requirement for the lessee to submit a new $50,000

3

guaranty bond in the event that the existing structure is destroyed or damaged beyond repair, pending its submission of plans for a new building and a construction bond. The Lease is also silent as to whether the lessee is bound to submit plans or any bond to the lessor prior to actually demolishing a building that has been destroyed or damaged beyond repair (as opposed to tearing down a building that is an existing improvement, solely for the purpose of replacing it with something new, which clearly does – as per the Lease clause cited above –require the advance submission of plans and a construction bond to the lessor).

The Lease also provides that the lessee's breach of any of the conditions of the Lease will entitle the lessor to declare forfeiture, but the lessor must first provide the lessee with written notice of the conditions claimed to have been breached and give the lessee sixty days to cure. (*Id*. at pp. 23-24.) Finally, the Lease provides that the lessee is vested with "all of the rights and indicia of ownership" of the Property for the term of the Lease, so long as the lessee satisfies the terms of the Lease and assumes the burden of ownership. (*Id*. at p. 28.)

In addition to the terms of the Lease, the Counterclaim raises the following factual allegations, which the court will assume to be true for the purposes of the pending Motion to Dismiss:

- SP is a proper lessee under the Lease, by assignment from predecessors-in-interest.
- A three-story parking garage was built on the Property in 1950 by the lessee at the time. In 2014, SP determined that this structure was damaged beyond repair and could no longer be safely used. As a result, SP closed the parking garage and then demolished it in February of 2015. Yellow Jacket was aware of the demolition in advance and voiced no objection.

- Following the demolition, SP continued to pay rent to Yellow Jacket, and Yellow Jacket continued to accept the payments.

- SP later informed Yellow Jacket that it intended to construct a surface parking lot as an interim use of the Property but, beginning in early June of 2015, Yellow Jacket refused to cooperate in assisting SP to secure the necessary municipal approval for construction of the surface parking lot to begin. Specifically, Yellow Jacket refused to sign a document required by Metro government for approval of the surface parking lot.

- On July 24, 2015, Yellow Jacket delivered a letter to SP, stating that SP had breached the Lease by failing to deposit a $50,000 bond and by failing to provide Yellow Jacket with plans, specifications, and a construction contract.[3]

- Although SP did not believe it was in breach of the Lease, within 60 days of receiving Yellow Jacket's letter, SP delivered to Yellow Jacket a performance bond in the amount of $50,000 as well as construction plans and a cost estimate of $250,000 for a *surface parking lot* to be constructed on the Property. SP does not allege in the Counterclaim that it has yet provided Yellow Jacket with the plans and specifications for a new *building* to be erected on the Property, as

---

[3] According to the Counterclaim, Yellow Jacket's letter specifically admonished SP for not having deposited a $50,000 bond with *Commerce Union Bank* and submitted construction plans to *Jay Stephenson*, though that particular bank was no longer in existence and Mr. Stephenson was deceased. Assuming the allegations in the Counterclaim are true, a reasonable understanding of this letter is that Yellow Jacket was asserting its position that the Lease required a $50,000 guaranty bond and construction plans to have been submitted to Yellow Jacket prior to the demolition of the parking garage. As discussed more fully below, the question of whether this is an accurate interpretation of the Lease is a question of fact that cannot be properly decided at this time.

required under the Lease, though it does allege that it informed Yellow Jacket that the surface parking lot would be an *interim* use only.

- Even after receiving the plans for the surface parking lot and the $50,000 bond, Yellow Jacket continued to contend that SP was in breach of the Lease and sent notice purporting to terminate SP's tenancy of the Property. Yellow Jacket then initiated this action when SP refused to vacate the Property.

- As a consequence of Yellow Jacket's refusal to cooperate with SP's efforts to secure the necessary approvals to begin construction, as well as Yellow Jacket's ongoing efforts to terminate SP's tenancy of the Property, SP has been unable to construct a surface parking lot and, therefore, unable to generate any revenue from the Property. SP has, accordingly, lost revenues of approximately $140,000 from August 1, 2015 until the time the Counterclaim was filed and continues to lose revenues at a rate of approximately $20,000 per month thereafter.

- SP has continued to pay all rent as due under the Lease.

(Docket No. 13.)

The Counterclaim argues that the Lease is a valid and enforceable contract, that SP has performed its obligations under the Lease and has not breached and that, even if SP had breached, terminating the Lease (with nearly thirty years remaining) would anyway be an inequitable outcome. The Counterclaim further asserts that Yellow Jacket has breached the duty of good faith and fair dealing by refusing to cooperate with SP in securing the necessary government approvals to construct a surface parking lot on the Property and in insisting that SP's tenancy should be forfeited. According to SP, Yellow Jacket has acted in bad faith in order to force SP from the Property and deny SP its benefit under the Lease of a below-market rent for

6

the Property for the remainder of the Lease term. SP seeks compensatory damages in the amount of its lost revenues, as well as attorney's fees and costs.

On April 22, 2016, Yellow Jacket filed a Motion to Dismiss SP's Counterclaim under Rule 12(b)(6), along with a Memorandum in support, arguing that SP has failed to state a claim. (Docket Nos. 16, 17.)

On May 6, 2015, SP filed a Response in opposition to Yellow Jacket's Motion to Dismiss. (Docket No. 21.) On May 19, 2016, SP filed a Supplement to its Response in opposition to Yellow Jacket's Motion to Dismiss, attaching emails evidencing Yellow Jacket's alleged bad faith in accusing SP of breaching the Lease and in refusing to cooperate with SP in obtaining government approval to construct a surface parking lot on the Property.[4]

On July 11, 2016, while the Motion to Dismiss SP's Counterclaim was pending, Yellow Jacket filed an Amended Complaint, with leave of court, which incorporates the claims from the original Complaint filed in the General Sessions Court and adds additional allegations and theories of recovery. Namely, as an apparent alternate theory to the allegation that SP breached the Lease, Yellow Jacket raises in its Amended Complaint the argument that SP is not, in fact, a proper assignee of rights as a lessee under the Lease or, alternatively, that a contract of novation was created upon assignment to SP, by which Yellow Jacket has the right to alter the terms of the Lease. (Docket No. 41.)

On August 12, 2016, SP filed an Amended Answer to the Amended Complaint. (Docket No.43.) Pursuant to the court's August 25, 2016 Order, SP was permitted to amend its Answer to the Amended Complaint yet again to incorporate its previously filed Counterclaim (refiled as

---

[4] SP does not provide a legal basis for the court to consider this evidence at this phase of the litigation, but the court need not reach this question to determine that, even without this additional evidence, SP has sufficiently pled a cause of action against Yellow Jacket for breach of contract based on the allegations contained it its Counterclaim.

an Amended Counterclaim and located in the record at Docket No. 49), and the court reinstated Yellow Jacket's pending Motion to Dismiss SP's Counterclaim, which is the subject of this opinion. (Docket No. 48.)

## **LEGAL STANDARD FOR MOTIONS TO DISMISS**

In deciding a motion to dismiss for failure to state a claim under Rule 12(b)(6), the court will "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff." *Directv, Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007); *Inge v. Rock Fin. Corp.*, 281 F.3d 613, 619 (6th Cir. 2002). The Federal Rules of Civil Procedure require only that a plaintiff provide "a short and plain statement of the claim that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Conley v. Gibson*, 355 U.S. 41, 47 (1957). The court must determine only whether "the claimant is entitled to offer evidence to support the claims," not whether the plaintiff can ultimately prove the facts alleged. *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511 (2002) (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)).

The complaint's allegations, however, "must be enough to raise a right to relief above the speculative level." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). To establish the "facial plausibility" required to "unlock the doors of discovery," the plaintiff cannot rely on "legal conclusions" or "[t]hreadbare recitals of the elements of a cause of action," but, instead, the plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009). "[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss." *Id.* at 679; *Twombly*, 550 U.S. at 556.

## **ANALYSIS**

Yellow Jacket advances two main arguments for why SP's Counterclaim should be dismissed. The first is that SP breached the Lease and, therefore, all actions Yellow Jacket took in response – including refusing to sign the government documentation necessary for SP to construct a surface parking lot on the Property – were consistent with Yellow Jacket's right to terminate the Lease and were not in violation of the Lease. The second argument is that SP's Counterclaim fails to state a claim because breach of the duty of good faith and fair dealing is not a standalone claim under Tennessee law and is recognized as a claim only when it is raised as a type of claim for breach of contract. For the reasons discussed more fully below, the court finds that both of Yellow Jacket's arguments fail. First, a finding by the court that SP violated the Lease – rendering Yellow Jacket's subsequent alleged actions lawful – would require a factual determination that cannot be made at this time. The parties presently dispute the proper interpretation of the ambiguous terms of the Lease as well as the facts of what took place between them. For purposes of the pending motion, the court must assume the truth of the facts as presented by SP, which support a finding that SP did not, in fact, breach the Lease. Second, while SP has not used the express term "breach of contract," it is clear that the Counterclaim is, in fact, a breach of contract claim, albeit one for breach the specific duty of good faith and fair dealing that is read into all contracts under Tennessee law.

I. **The Court Cannot Find At This Time That SP Breached the Lease**

In order for the court to accept Yellow Jacket's argument that SP breached the Lease and, therefore, Yellow Jacket acted within its rights to treat the Lease as terminated, the court would have to find that Yellow Jacket has proven its own detainer claim in this action before the parties have even been given an opportunity to begin discovery. The terms of the Lease, however, are not so clear, nor are the relevant facts undisputed. At a minimum, the following questions

9

remain to be resolved: 1) whether the Lease calls for the submission of any bond or plans for the construction of a new building prior to the lessee fully demolishing a building that is destroyed or damaged beyond repair; 2) whether, even if the Lease does require a bond or construction plans to be submitted prior to such demolition, the parties waived or modified this requirement by oral agreement prior to SP's demolition of the parking garage on the Property; 3) whether, to the extent that the Lease required a $50,000 guaranty bond be submitted either before or immediately after demolition and SP failed to provide this, SP nonetheless cured its breach within the 60-day cure period provided under the Lease; and 4) whether, even if SP did breach the Lease, the breach equitably warrants forfeiture.

Assuming – as the court must do for the purposes of this Motion to Dismiss – that the facts as alleged in SP's Counterclaim are true and SP's interpretation of the Lease is proper (meaning SP did not breach the Lease), SP has stated a claim for breach of the Lease by Yellow Jacket and should be entitled to pursue its Counterclaim, in addition to defending against Yellow Jacket's detainer action. It may, as Yellow Jacket asserts, ultimately be determined that SP is either not a proper lessee under the Lease or breached the Lease in such a way as to warrant forfeiture. In that event, the court will never need to reach SP's Counterclaim or the question of whether Yellow Jacket acted in bad faith. At this early stage of the litigation, however, the court can make no such determination.

Accordingly, the court cannot dismiss SP's counterclaim based on Yellow Jacket's version of events but must allow the Counterclaim to proceed to discovery.

## II.  SP Has Properly Asserted a Counterclaim for Breach of Contract

As to Yellow Jacket's argument that there is no independent claim for breach of good faith and fair dealing under Tennessee law, the parties, in fact, concede – and the

court finds – that this is a correct statement of the law. *See, e.g., Shah v. Racetrac Petroleum Co.*, 338 F.3d 557 (6th Cir. 2003). The parties also both acknowledge, however, that the duty of good faith and fair dealing is read into every contract under Tennessee law, and a breach of contract claim may be premised on the breach of this duty.

> Under Tennessee Law, every contract carries with it an implied covenant of good faith and fair dealing. As a result of this covenant, each contracting party promises to perform its part of the contract in good faith and, in return, expects the other party to do the same. The purpose of the implied-in-law covenant is two-fold. First, it honors the contracting parties' reasonable expectations. Second, it protects the rights of the parties to receive the benefits of the agreement they entered into. The implied obligation of good faith and fair dealing does not, however, create new contractual rights or obligations, nor can it be used to circumvent or alter the specific terms of the parties' agreement.

*Goot v. Metro. Gov't of Nashville and Davidson Cnty.*, No. M2003-02013, 2005 WL 3031638, at *7 (Tenn Ct. App. Nov. 9, 2005) (internal citations omitted); *see also Dick Broadcasting Co., Inc. of Tennessee v. Oak Ridge FM*, *Inc.*, 395 S.W.3d 653, 660 (Tenn. 2013) ("It is well established that in Tennessee, the common law imposes a duty of good faith in the performance of contracts."); *Hometown Folks, LLC v. S&B Wilson, Inc.*, 643 F.3d 520, 526 (6th Cir. 2011) (holding that Tennessee law imposes a duty of good faith on every contract, which can be breached either by action or inaction). Counter to Yellow Jacket's assertions, SP's Counterclaim is not an independent claim for breach of good faith that arises outside of any contractual relationship. To the contrary, it is clearly a breach of contract claim based on Yellow Jacket's alleged breach of its duty to use the standards of good faith and fair dealing in carrying out its obligations under the Lease.

Yellow Jacket correctly notes that, under Tennessee law, the standard of good faith and fair dealing must be tied to a specific term of a contract, rather than interpreted as creating

11

independent obligations. *See Dick*, 395 S.W.3d at 666 (holding that the duty of good faith, however, "'does not extend beyond the terms of the agreed upon terms of the contract and the reasonable contractual expectation of the parties.'") (quoting *Wallace v. Nat'l Bank of Commerce*, 938 S.W.2d 684, 687 (Tenn. 1996)). Yellow Jacket's most compelling argument for dismissing SP's counterclaim, then, is that there is no express term in the Lease providing that the lessee may benefit from an interim use of the Property, in the event that the requisite building has been damaged or destroyed beyond repair and the lessee's construction of a new building is pending. Nor is there any express provision requiring the lessor to assist the lessee in securing permissions for such use. Indeed, one of the primary aims of the Lease is the lessee's obligation to build and maintain on the Property a *building* worth at least $200,000. The court finds, however, that it is an overly narrow reading of the Lease to thus conclude that there is no term by which the lessor must act in good faith in considering the lessee's request for approval of an interim use of the Property. In fact, an even more basic impetus for the Lease than the construction of a building on the Property is the lessee's right to occupy the Property, in exchange for rental payments to the lessor. A lease of real property, by its very nature, is designed to allow a lessee the right to occupy and use the property. The Lease at issue here is no exception, and it expressly provides that the lessee should have peaceable and uninterrupted possession of the Property, with all of the rights and indicia of ownership.

As it currently stands, SP is unable to use the Property. SP has alleged that, as the rightful lessee, continuing to pay rent to Yellow Jacket, it seeks to make use of the Property as a surface parking lot while the erection of a new building, to be built within five years to meet the Lease terms, is pending. Yellow Jacket, as the owner and lessor, has hindered SP's ability to benefit from such an interim use, denying SP this right of ownership and possession of the

12

Property. SP has alleged that Yellow Jacket has taken this stance in bad faith, in order to force SP from the Property. SP's Counterclaim need not be tied to a term of the Lease expressly anticipating the Property's interim use as a surface parking lot, or any other interim use of the Property in the event the building was damaged beyond repair. It is sufficient that SP's Counterclaim is tied to the most basic term of the Lease, which simply requires Yellow Jacket to allow SP continued possession of the Property with the rights of ownership. It is this basic obligation that SP alleges Yellow Jacket has failed to carry out in good faith.

Accordingly, SP's Counterclaim has sufficiently stated a claim for relief and is not subject to dismissal at this time.

## CONCLUSION

For the foregoing reasons, the Motion to Dismiss SP's Counterclaim will be denied.

An appropriate order will enter.

_____
ALETA A. TRAUGER
United States District Judge